**UNITED STATES of America, Appellee,**

v.

**Everett Aaron BROWN, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Jerry Lee DORSEY, Appellant.**

**Nos. 90–1220, 90–1214.**

United States Court of Appeals,
Eighth Circuit.

Submitted Aug. 28, 1990.

Decided Dec. 24, 1990.

Robert J. Benbenek, St. Louis, Mo., for appellant Brown.

Daniel P. Reardon, Jr., Clayton, Mo., for appellant Dorsey.

Michael W. Reap, St. Louis, Mo., for appellee.

Before BOWMAN, WOLLMAN, and BEAM, Circuit Judges.

BEAM, Circuit Judge.

Jerry Lee Dorsey appeals from his conviction for attempt to possess phencyclidine (PCP) with intent to distribute. Everett Aaron Brown appeals from his conviction for attempt to possess PCP with intent to distribute and for carrying a firearm during and in relation to a drug trafficking offense. Dorsey contends that the sentence he received is "unjust" because his base offense level was determined according to the total quantity of PCP and ether mixture rather than the relatively small amount of pure PCP involved. Dorsey also argues that the district court erred in sentencing him by failing to depart from the sentencing guidelines on the basis of mitigating factors. Brown, on the other hand, argues that there was insufficient evidence on both charges to support his conviction and that the trial court erred in denying his motion for severance of his trial from Dorsey's and in denying his motion for severance of the offenses charged against him. We affirm.

## I. BACKGROUND

On March 24, 1989, United States postal inspectors in St. Louis, Missouri, searched, pursuant to a search warrant, an express mail package en route from California. The package was addressed to "Betty Adams" at 4028–A Cleveland Avenue in St. Louis. Inside the package, postal inspectors found a mouthwash bottle containing PCP. Postal inspectors removed the bottle, poured a small amount of the PCP into a small glass vial, and then placed the vial and a mouthwash bottle disguised to look like the original bottle of PCP back in the package. Pursuant to a court order, the package was equipped with an electronic beeper that would signal law enforcement officers when the package was reopened.

On March 28, 1989, a United States postal inspector delivered the package to 4028–A Cleveland Avenue, a single unit in a small apartment house in St. Louis. A woman named Brenda Jacobs received and signed for the package. Later that afternoon, appellants Dorsey and Brown arrived together at the apartment building. Within a few minutes of their arrival, the electronic beeper signaled law enforcement officers that the package had been opened. The officers immediately entered the apartment pursuant to a search warrant.

The first officer in the apartment saw appellant Dorsey with a brown paper package wrapped in tape in his hand. Dorsey ran away from the officer but was apprehended in the kitchen, where he put the package on a table and told the officer that it did not belong to him. The package contained the mouthwash bottle which had been disguised to look like the original bot-

tle of PCP. The second officer entering the apartment rushed into a bedroom adjacent to the entryway. In this room he found the appellant Brown and Brenda Jacobs. According to the officer's testimony, the express mail package was open on a bed and Brown was trying to put a pistol (later determined to be a loaded .38 caliber revolver) underneath the mattress. The officer testified that he ordered Brown to drop the gun and that Brown did so after a few seconds. Trial transcript, vol. I, at 30–31, 48–51. The third officer who entered the apartment—the second officer into the room in which Brown and Jacobs were found—testified that Brown was not holding the pistol when he entered the room, but that the pistol was on the floor under the mattress. Trial transcript, vol. III, at 5–6, 9–10. Dorsey, Brown, Jacobs, and a fourth occupant of the apartment (who was later determined to have simply been present at the time the officers arrived) were arrested by the officers.

Dorsey and Brown were indicted together and tried jointly in district court. Jacobs and the fourth occupant of the apartment were not charged with any crime. Dorsey and Brown were charged with attempted possession with intent to distribute PCP, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(iv) and 846. Brown was also charged with using and carrying a dangerous weapon during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1).

An investigation revealed that the apartment at 4028–A Cleveland was the residence of Dorsey and Jacobs. The search of the apartment revealed a number of pieces of circumstantial evidence. For example, officers found—in addition to the loaded .38 caliber pistol—several .38 caliber bullets, .22 caliber bullets, a smoking pipe, a razor blade, "ziplock baggies" on the fireplace mantel, and two triple-beam scales in the kitchen of the apartment. Moreover, records obtained from Western Union showed that on March 22, 1989, Dorsey had wired $2,300 to a person in Los Angeles, California. In addition, records of the telephone company revealed that three telephone calls from an unidentified telephone in St. Louis were made to the Los Angeles area of California the day of and the day prior to the arrest. The calls were charged to the telephone account of Dorsey's parents. Investigation also revealed that, prior to delivery of the PCP, Dorsey had approached his mail carrier on two occasions to inquire about the arrival of a package addressed to "Betty Adams."

Before trial, several motions were filed, including motions by Dorsey and Brown for severance of their trials and a motion by Brown to sever the offenses charged against him. All of these motions were denied by the district court. At trial, Dorsey testified in his own defense. He acknowledged sending $2,300 to California, but he claimed that the money was actually a loan from him to Brown and that he was merely sending it on Brown's behalf. According to Dorsey's testimony, he did not know at the time the money was wired to California that it was being used to purchase an illegal drug. Dorsey also said that when the package arrived, he opened it and was going to pour its contents down the drain of the kitchen sink because he detected the smell of PCP. Trial transcript, vol. III, at 51–52, 56–57. Dorsey admitted owning the gun that was found with Brown. Brown did not testify.

Also at the trial, there was testimony concerning the way in which PCP—which is legitimately sold as a tranquilizer for animals—is used in the illicit drug market. One government witness explained that tobacco and marijuana cigarettes are often dipped into a liquid mixture of PCP and ether. The evaporativity of the ether allows the cigarettes to dry quickly and the PCP ingredient left in the cigarette produces an hallucinatory effect on the smoker. An ounce of PCP-ether mixture will usually be enough to produce about sixty cigarettes laced with PCP, each of which sells on the market for about $10.00. Trial transcript, vol. II, at 60–65.

Dorsey and Brown were convicted by a jury in September 1989 and were sentenced by the district court the following December. Dorsey was sentenced to 121 months imprisonment and Brown received consecu-

tive prison sentences of 360 months for the narcotics charge and 60 months for the firearm charge. Dorsey and Brown raise separate issues on appeal.

## II. DISCUSSION: DORSEY

### A. Determination of Base Offense Level According to Total PCP–Ether Mixture

■ Dorsey contends that the sentence he received is "unjust" because his base offense level under the guidelines was determined by the total quantity of PCP and ether mixture, without any regard for the quantity of pure PCP contained in the mixture. While Dorsey does not explicitly state a legal basis for this assertion, he alludes to a claim of a violation of the due process clause and we will treat it as such for purposes of this appeal.[1] Because this issue is one of federal constitutional law, our standard of review is *de novo*. *Jenkins by Agyei v. Missouri*, 807 F.2d 657, 703 (8th Cir.1986), *cert. denied*, 484 U.S. 816, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987).

■ Base offense levels for unlawful trafficking in drugs are determined under the guidelines by reference to the Drug Quantity Table set forth in section 2D1.1(c) of the Guidelines Manual (unless the offense involves death or serious bodily injury). Under the Drug Quantity Table, the base offense level increases one level for each incremental increase in the quantity of the drug involved. PCP is quantified at each applicable level of the Table according to the two forms in which the drug can be found: either as part of a mixture or as a pure drug. (At each base offense level, the mixture-purity ratio for these quantities is ten to one.)[2] Under the Drug Quantity Table, the quantity to be used in determining the base offense level in cases involving PCP is that quantity which will result in the highest base offense level. The guidelines under which Dorsey's sentence was calculated provide the following in a note to the Drug Quantity Table: "Consistent with the provisions of the Anti–Drug Abuse Act, if any mixture of a compound contains any detectable amount of a controlled substance, *the entire amount of the mixture or compound shall be considered in measuring the quantity.*" United States Sentencing Commission, *Guidelines Manual*, App. C, amend. 125 (Nov.1989) (emphasis added).[3]

According to Dorsey's presentence report, which was adopted by the district court, the total quantity of PCP-ether mixture involved in this case was approximately 835 grams and the purity level of this mixture was 4.7%.[4] Thus, the total quantity of the pure PCP only amounted to approximately 39 grams (a mixture-purity ra-

---

1. Dorsey's appeal could also be considered an eighth amendment challenge on the basis that the sentence he received constitutes cruel and unusual punishment. But Dorsey's punishment is not so disproportionate to his crime that it meets the test established by the Supreme Court in *Solem v. Helm*, 463 U.S. 277, 290–92, 103 S.Ct. 3001, 3009–11, 77 L.Ed.2d 637 (1983). *See also United States v. Buckner*, 894 F.2d 975, 980–81 (8th Cir.1990) (crack cocaine penalties are not unconstitutional). Any such claim, therefore, would be without merit.

2. By distinguishing between a mixture containing PCP and pure PCP and by adopting a ratio between the two of 10:1, the Drug Quantity Table is consistent with statutory provisions prohibiting trafficking in PCP. *See* 21 U.S.C. §§ 841(b)(1)(A)(iv), (b)(1)(B)(iv).

3. This reference note to the Table was removed by the Sentencing Commission, effective November 1, 1989, and replaced with the following:

Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance.... In the case of a mixture or substance containing PCP or methamphetamine, use the offense level determined by the entire weight of the mixture or substance or the offense level determined by the weight of the pure PCP or methamphetamine, *whichever is greater.*

United States Sentencing Commission, *Guidelines Manual*, App. C, amend. 125 (Nov. 1989) (emphasis added). The Commission noted—in apparent reference to this particular change—that the "purposes of this amendment are ... to delete an unnecessary footnote, and to clarify the operation of the guideline." *Id.*

4. The total quantity of the mixture in the small vial and its purity level could not be determined because the liquid in the vial had spilled sometime before analysis.

tio of less than twenty to one). The district court, by following the note appended to the Drug Quantity Table, set Dorsey's base offense level at thirty, based on the quantity of the entire mixture. Dorsey claims this is "improper" and "unjust" (and thus a violation of due process) because his sentence was in no respect related to the level of pure PCP in the mixture. To illustrate his point, counsel for Dorsey noted at oral argument that the base offense level under the Drug Quantity Table would have been twenty-six if determined solely by the amount of pure PCP involved.

The constitutionality of the note appended to the Drug Quantity Table, and its application in a similar case (involving methamphetamine), was recently considered by this court in *United States v. Murphy*, 899 F.2d 714 (8th Cir.1990). As we explained in *Murphy*, "Due process is satisfied if the statute or regulation in question bears a 'reasonable relation to a proper legislative purpose' and is 'neither arbitrary nor discriminatory.'" *Id.* at 717 (quoting *United States v. Bishop*, 894 F.2d 981, 986 (8th Cir.1990)). Applying the "reasonable relation" test, *Murphy* decided that "[t]he Sentencing Commission's decision to determine a defendant's offense level on the basis of the entire weight of the methamphetamine mixture involved satisfies due process." 899 F.2d at 717. We can find no basis for distinguishing

Dorsey's case involving PCP from the decision in *Murphy*.

■ It is neither arbitrary nor irrational to sentence according to the total quantity of the PCP mixture involved, without regard to the purity. As we stated in *Bishop*, "[B]asing sentencing on the quantity of drugs without regard to purity is reasonably related to the proper legislative purpose of penalizing large volume drug traffickers more harshly." 894 F.2d at 986. Dorsey's sentence bears an obvious and reasonable relationship to that legislative purpose: although Dorsey's ether-PCP mixture was of a relatively high ratio, this simply would have enabled Dorsey to distribute more PCP-laced cigarettes.[5]

### B. *Nondeparture from Guidelines in Sentencing Dorsey*

■ Dorsey argues that the district court abused its discretion by not departing downward from the sentencing guidelines on the basis of mitigating circumstances that were not adequately considered in the formulation of the guidelines. *See* 18 U.S.C. § 3553(b) (1988). More specifically, according to Dorsey, the district court erred in not departing on the basis of the following factors: the relatively small amount of pure PCP involved, his lack of a criminal record, his testimony at trial that he did not know an illegal drug was being purchased with the $2,300 he wired to Cali-

---

**5.** Counsel for Dorsey was correct in stating at oral argument that if Dorsey had increased the ratio of ether to PCP—or "watered it down" even more—his sentence might have increased. In this case, however, it is not necessary to consider the consequences of this rationale if pushed to an extreme. It is possible for someone to mix a very large amount of ether with a very small amount of pure PCP to produce an extremely "watered down" mixture that contains a "detectable amount" of the drug. And, under the guidelines, the sentence when caught with such a mixture might be excessively harsh. But such is not the case before us. "Our job is not to speculate about 'extraordinary circumstances in which a legislative scheme breaks down; we live in a real world, and so apply the law to real world facts....'" *Bishop*, 894 F.2d at 986 (quoting *United States v. Marshall*, 706 F.Supp. 650, 653 (C.D.Ill.1989)).

It might also be true that sometimes the quantity of the PCP *mixture* in the hands of a distrib-

utor so far exceeds the quantity of the *pure* PCP when it was in the hands of the wholesaler that under the guidelines the punishment the distributor receives is far more severe than the punishment the wholesaler receives. In other words, "[b]ig fish then could receive paltry sentences or small fish draconian ones." *United States v. Marshall*, 908 F.2d 1312, 1315 (7th Cir.1990) (statutes and guidelines are not unconstitutional for basing their computations on the total weight of LSD plus its carrier), *cert. granted,* —— U.S. ——, 111 S.Ct. 579, 112 L.Ed.2d 584 (1990). But "[i]t has never been considered a feasible judicial undertaking to rationalize, to codify—realistically, to rewrite—the federal criminal code in order to make it the product of a single mind, or of a single overarching conception of rational punishment, urgent as this task may well be." *United States v. Rose*, 881 F.2d 386, 389 (7th Cir.1989).

fornia, and his cooperation with officials after his arrest.

■■■ Dorsey is correct, as he states in his brief, that the district court, pursuant to section 3553(b), has a limited authority to depart from the sentencing range established by the guidelines. In Dorsey's case, however, the district court decided not to depart and, on review, this court is to uphold a district court's sentence under the sentencing guidelines unless it: "(1) was imposed in violation of law; (2) was imposed as a result of an incorrect application of the sentencing guidelines; (3) is outside the applicable guideline range, and is unreasonable ...; or (4) was imposed for an offense for which there is no applicable sentencing guideline and is plainly unreasonable." 18 U.S.C. § 3742(e) (1988). If a sentencing court exercises its discretion by refusing to depart from the sentencing range established by the guidelines, this court is not permitted to review the sentence. *See United States v. Evidente*, 894 F.2d 1000, 1003–04 (8th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 1956, 109 L.Ed.2d 318 (1990). We hold, therefore, that we lack authority to review this aspect of Dorsey's sentence.

## III. DISCUSSION: BROWN

### A. *Sufficiency of the Evidence*

■■ Everett Brown contends that the evidence in this case was insufficient to support a conviction on either charge against him and, therefore, the district judge erred in denying his motions for judgment of acquittal. We disagree and find that the evidence with respect to both counts was sufficient to support the jury's verdict.

■■■ Our standard of review when considering the sufficiency of the evidence is well established. This court must view the evidence in the light most favorable to the government and sustain the verdict if it is supported by substantial evidence. *United States v. Marin–Cifuentes*, 866 F.2d 988, 992 (8th Cir.1989); *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Moreover, on appeal, the government must be given

the benefit of all inferences that may logically be drawn from the evidence. *Marin–Cifuentes*, 866 F.2d at 992. It is not necessary that the evidence exclude every reasonable hypothesis except guilt; instead, the evidence is simply sufficient if it will convince a trier of fact beyond a reasonable doubt that the defendant is guilty. *Id.* This court will not disturb a conviction if the evidence rationally supports two conflicting hypotheses. *United States v. Schubel*, 912 F.2d 952, 955 (8th Cir.1990). Each of the elements of the crime charged may be proven by circumstantial evidence, as well as by direct evidence. *Marin–Cifuentes*, 866 F.2d at 992. And finally, this court "must keep in mind that the standard to be applied to determine the sufficiency of the evidence is a strict one, and the finding of guilt should not be overturned lightly." *Schubel*, 912 F.2d at 955.

■■■ First, we consider the sufficiency of the evidence with respect to the charge against Brown of attempting to possess PCP with an intent to distribute. According to the definitional standard for crimes of attempt established by this court in *United States v. Joyce*, 693 F.2d 838 (8th Cir.1982), the requisite elements of the crime in this case are: (1) an intent by Brown to engage in criminal conduct—that is, the possession of PCP with intent to distribute; and (2) conduct by Brown constituting a "substantial step" towards the commission of the substantive offense which strongly corroborates Brown's criminal intent. *See id.* at 841.

Brown asserts that the only evidence against him on the drug charge is the circumstantial evidence of his mere presence at Dorsey's apartment on the date of arrest and the direct evidence provided by Brenda Jacobs's testimony. Brown contends, moreover, that Jacobs's testimony is unreliable because Jacobs suffers from a mental impairment and because her testimony contained contradictions and lies and was given under a grant of immunity from prosecution.

Brown, however, does not give a complete account in his brief of the evidence against him. There was certainly suffi-

cient evidence, both circumstantial and direct, to prove that Brown intended to possess PCP for purposes of distribution; and a reasonable jury could conclude that Brown took a "substantial step" toward the commission of that offense. The beeper planted in the package alerted officers that the package was opened within a few minutes after Brown and Dorsey arrived at the apartment. One of the first officers into the apartment testified that he found Brown with a gun in his hand and in the same room with the package that had just been opened. Dorsey testified that Brown solicited the money for the PCP from him and that it was Brown's source in California from whom the drug was eventually obtained. And Jacobs's testimony included statements that both Brown and Dorsey opened the package and were very excited about the delivery, and that Brown directed Dorsey to get rid of the drugs when he realized law enforcement officers were entering the apartment. Trial transcript, vol. II, at 31–32.

■■■ Furthermore, intent to distribute, an essential element of the crime of which Brown was convicted, can be inferred solely from possession of a large quantity of drugs. *United States v. Brett*, 872 F.2d 1365, 1370 (8th Cir.), *cert. denied*, — U.S. ——, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989); *United States v. LaGuardia*, 774 F.2d 317, 320 (8th Cir.1985). According to one witness' testimony at trial, the quantity of PCP mixture involved in this case would have been enough to create nearly 2000 cigarettes laced with PCP. And the retail value of this quantity, depending on the form in which it was sold, was between $11,000 and $19,000. The presence of a firearm, which is generally considered a tool of the trade in drug dealing, is also circumstantial evidence of an intent to distribute. *Brett*, 872 F.2d at 1370; *LaGuardia*, 774 F.2d at 320. The evidence in this case showed that the appellant Brown was in possession of a loaded .38 caliber pistol when the officers entered the apartment. The large quantity of PCP together with the presence of the gun surely constitutes sufficient evidence by which a jury may properly infer an intent to distribute.

■■■ Brown's argument that Jacobs's testimony is unreliable and should not be considered as evidence against him is without merit. It may or may not be true that Jacobs lacked forthrightness and consistency in her testimony, but it is a well-settled rule that on review we are not to judge the credibility of witnesses—that task is a function of the jury, not an appellate court. *United States v. Williams*, 897 F.2d 1430, 1432 (8th Cir.1990); *United States v. Eisenberg*, 807 F.2d 1446, 1456 (8th Cir.1986).

■■■ Second, we consider the sufficiency of the evidence with respect to the firearm charge against Brown. Section 924(c)(1) provides in part: "Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such ... drug trafficking crime, be sentenced to imprisonment for five years...." 18 U.S.C. § 924(c)(1). Brown argues that the evidence presented by the government on the firearm charge was insufficient because it was inconsistent, contradictory, and uncorroborated. Brown contends that Officer Ampelman, the first officer into the room of the apartment in which Brown and Jacobs occupied, gave inconsistent accounts before and at trial regarding where Brown was situated when he entered the room. Brown argues, furthermore, that according to Ampelman's testimony, the second officer into the room, Officer Hearne, arrived "within seconds" or "immediately" after Ampelman; yet, according to Hearne's testimony, he did not see Brown holding the gun and did not hear Ampelman order Brown to drop the gun. Brown maintains, therefore, that if Ampelman's testimony is true, Hearne would have heard or seen more than he did. Brown also notes that although Jacobs heard the police tell Brown to drop the gun, she did not see Brown with the gun. Finally, Brown notes that Dorsey testified at trial that Brown did not know of the gun nor have possession of the gun on the day of the arrest.

As we noted above, this court is not to judge the credibility of witnesses or resolve

conflicting testimony. The believability, therefore, of Officer Ampelman's testimony—indeed, of all the witnesses who testified—is to be determined by the jury. *Williams,* 897 F.2d at 1432; *Eisenberg,* 807 F.2d at 1456. Moreover, we do not see any inherent conflict between the testimony of officers Ampelman and Hearne. According to the testimony of Ampelman, Brown had a pistol in his hand and was trying to conceal it when Ampelman entered the room. Ampelman testified that "five seconds" probably elapsed between the moment he entered the room and the moment Brown dropped the pistol. Trial transcript, vol. I, at 50. Officer Hearne testified: "I was there right after [Ampelman], so, you know, five, ten, fifteen seconds." Trial transcript, vol. III, at 9. There is no time conflict between the testimony of Ampelman and Hearne and it is entirely reasonable that Hearne could not see Brown with the gun or—given the likely noise and commotion of the entry of the officers into the apartment—hear Ampelman's order to drop the weapon. Furthermore, Jacobs's testimony, rather than contradicting Ampelman's, could reasonably appear to support it. Jacobs's attention was probably focused on the police as they entered the apartment, not on Brown. Thus, she testified that she did not see Brown holding the gun but she did hear the police order him to drop it. Brown, moreover, while in possession of the pistol, was in close proximity to the recently opened express mail package. Considering all the evidence and given the well-recognized nexus between the drug trade and firearms, a reasonable jury could determine that Brown violated 18 U.S.C. § 924(c)(1).

B. *Denial of Motion for Severance of Trial and Offenses*

█ The final issue raised by Brown is his claim that the trial court abused its discretion by not granting relief from joinder of his trial with Dorsey's and from joinder of his drug and weapon offenses. Brown made a pretrial motion, pursuant to Federal Rules of Criminal Procedure 14, that he was prejudiced by the joinder.[6] Brown renewed these points as part of his motion for a new trial, which motion was filed after the verdict of guilty. However, he did not renew his motion either at the close of the government's evidence or at the close of the entire case, as required by a long line of decisions in this circuit. *See, e.g., United States v. Reed,* 658 F.2d 624, 629 (8th Cir.1981), *cert. denied,* 455 U.S. 1002, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982); *United States v. Brim,* 630 F.2d 1307, 1310 (8th Cir.1980), *cert. denied,* 452 U.S. 966, 101 S.Ct. 3121, 69 L.Ed.2d 980 (1981); *see also* Wright, Federal Practice and Procedure: Criminal 2d § 221 n. 7 (1982) (cases cited therein). We hold, therefore, that Brown has waived his objection by failing to renew it at the appropriate time.

█ Our holding is not an instance of adherence to a rule at the cost of injustice. Even if Brown's objection to joinder had been properly renewed, there would not be cause to reverse the district court's decision.

A motion to sever under Rule 14 of the Federal Rules of Criminal Procedure is addressed to the sound discretion of the trial court. A denial of severance is not grounds for reversal unless clear prejudice and an abuse of discretion are shown. To establish grounds for reversal, a defendant must show something more than the mere fact that his chances for acquittal would have been better had he been tried separately. He must "affirmatively demonstrate that the joint trial prejudiced [his] right to a fair trial." *United States v. Knife,* 592 F.2d 472, 480 (8th Cir.1979) (citations omitted) (quoting *Golliher v. United States,* 362 F.2d 594, 603 (8th Cir.1966)). This is a difficult burden on an appellant. After reviewing the allegations made by Brown regarding how

---

6. Rule 14 provides, in part:
   If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. Fed.R.Crim.P. 14.

he was prejudiced, we find insufficient support for his argument.

## IV. CONCLUSION

For the reasons stated, the judgments under review are affirmed.